UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 20-80013-CR-Marra

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

v.

**DUSKO BRUER,**

      **Defendant.**

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America (hereinafter "the Government"), by and through the undersigned attorneys, hereby files its Sentencing Memorandum. Between 2007 and 2014, Defendant failed to report approximately $7,726,213 of income and evaded approximately $2,789,538 of tax on that income, failed to file and filed false income tax returns, stashed approximately $6,289,274 in offshore bank accounts, and spent lavishly on luxuries. The Government respectfully requests that the Court impose a reasonable sentence within the advisory Guidelines range of 46 to 57 months as it would take into account the nature and circumstances of the offense and the history and characteristics of the defendant, reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense as well as provide adequate deterrence to others contemplating similar acts. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A), & (a)(2)(B).

## PROCEDRUAL BACKGROUND

On or about January 30, 2020, Defendant was charged via Information with one count of Tax Evasion, in violation of Title 26 United States Code Section 7201, and one count of Willful

Failure to File a Report of Foreign Bank or Financial Account, in violation of Title 31 United States Code Sections 5314, 5322. DE1. Defendant pleaded guilty to both counts on April 3, 2020. DE35. The Court initially set sentencing for June 12, 2020. DE19. The Court continued the sentencing four times. DE 22,28, 30, 31. The sentencing hearing of Defendant has been set for May 14, 2021 at 1:30 pm. DE 43.

## FACTS

Although Defendant agreed to a detailed factual statement, DE 18, the Government has set forth the salient facts that the Court should consider in its application of the § 3553(a) factors.

In or about 2003, Defendant began operating a highly successful company (Company A) selling agricultural machinery and parts throughout the world.[1] Defendant reaped millions of dollars income. By 2008, Company A generated sufficient cash that Defendant could spend vast sums on personal expenses including:[2]

- $460,500 gifted to family members (2008 to 2011);

---

[1] References to Company A, Company B, Person A and Person B are carried forward from the pseudonyms used in the Factual Statement. DE 18.
[2] The earliest domestic bank records obtained by the Government were from January 2007. The Government has not been able to reconstruct Company A's finances prior to that time.

- $370,000 spent to purchase, register, dock, and service a 54-foot yacht (2010);



- $263,865 used to buy a residence for an employee (2009); and
- $255,000 invested in real property in Serbia (2008).

Defendant could afford such largess because he had stopped paying taxes or filing tax returns as of the 2000 tax year. Indeed, he wasn't just evading his own income taxes. He failed to file corporate tax returns as well as employment tax returns. As a result, he deprived the Treasury of both the employees' share of federal income, Social Security and Medicare taxes that federal law required Company A to withhold and pay over as well as the employer's share of the Social Security and Medicare taxes that Company A was obligated to pay.

Defendant embroiled others in his tax evasion schemes. In 2009, Defendant purportedly "gifted" Company A to Person A, who Defendant employed as his personal assistant. Person A has no business background, no business degree and had originally been hired to answer the telephone. Yet, Defendant made Person A the owner of his multi-million-dollar company. Later, Person A's sister, Person B, became the in-name-only owner of Company A, because Person A was in the process of getting divorced and she did not want the valuable company to be deemed a marital asset and subject to equitable distribution. Person B, a person with a similar dearth of business acumen, knew she had no authority over the day-to-day operations of Company A. Yet, from 2009 through 2011, Person B filed false Forms 1040 on which Person B reported income and expenses from Company A on a Schedule C. Person B falsely deducted Defendant's personal use of Company's A's funds (including Defendant's personal expenses, transfers to friends and families, and investments) as business expenses. Defendant paid Person B a nominal amount each year for acting as a nominee owner of Company A and filing false returns to hide Defendant's income.

Defendant had numerous opportunities to disclose his years of tax evasion and concealing income and assets in offshore bank accounts, but, each time one of those opportunities arose, Defendant chose either to outright lie about his income or to tell only a partial truth. Most egregiously, in 2014, Defendant received a notice from the IRS informing him that he had failed to file an individual income tax return for 2012. The IRS sent the notice because an insurance company issued Defendant a Form 1099 related to the distribution of $41,498 in income and the withholding of $2,161in tax. At that point in time, Defendant could have reported everything to the Service, made efforts to rectify 13 years of failing to file returns, and paid over the more than $2.5 million in tax that he owed, not to mention the penalties and interest. Instead, Defendant filed

a 2012 Form 104EZ on which he falsely claimed that he lived in Croatia, declared that he had no income, and requested the refund of the $2,161 withheld by the insurance company, which he received.

At the same time as he was evading his taxes, Defendant accumulated assets valued at $6,289,274 in at least seven different offshore bank accounts in Croatia, Germany, and Switzerland. Defendant funded these accounts, in part, with the Company A's profits. Between 2007 and 2011, Defendant transferred a net total of $5,817,038 from Company A's domestic accounts to the offshore bank accounts. Defendant used the untaxed funds in those offshore bank accounts to fund his luxury lifestyle, including:

- $1,650,000 to purchase a home on the Intercoastal Waterway in the name of a girlfriend (pictured below); and



- $1,350,000 to acquire a 90-foot yacht.



A bird's eye view of the yacht docked behind the waterfront home conveys the true size of the vessel:



With his Swiss accounts, Defendant took pains to conceal his connection to the United States as, by 2009, Credit Suisse had begun closing accounts for U.S. taxpayers.[3] Defendant signed account forms on which he misrepresented his domicile, falsely claiming that resided in Croatia. Defendant continued the subterfuge when he transferred funds from the Credit Suisse accounts to the domestic accounts of Company B. In the written instructions Defendant submitted to the bank he falsely referred to Company B as belonging to a family member. Defendant never reported the existence of the offshore bank accounts on either a tax return or a Report of Foreign Bank and Financial Accounts, nor did he report that income on his tax return and pay tax on that income.

Defendant closed the Credit Suisse account in 2015, but not of his own volition. Rather, on or about September 7, 2015, Credit Suisse sent Defendant a letter informing him that his account would be closed. Credit Suisse closed the account as it had confirmed that Defendant resided in the United States. In the letter, Credit Suisse encouraged him to enter the IRS's Voluntary Disclosure Program ("OVDP"), a program where U.S. taxpayers could avoid criminal prosecution by disclosing their felonious conduct and paying the taxes due and owing, as well as interest and penalties, including a penalty equal to 50% of the aggregate high value of the undeclared offshore accounts.[4]

---

[3] *See, e.g., Credit Suisse Starts Shutting U.S. Offshore Accounts: Report*, REUTERS (Apr. 12, 2009), *available at* https://www.reuters.com/article/us-csuisse/credit-suisse-starts-shutting-u-s-offshore-accounts-report-idUSTRE53B0XB20090412. On June 19, 2008, Bradley Birkenfeld, a former UBS banker, pled guilty in the Southern District of Florida, *see United States v. Birkfenfeld*, 08-cr-60099-WJZ (SDFL), and the Government's criminal investigation of the role offshore banks played in the evasion scheme became public. As part of its own guilty plea, Credit Suisse admitted that, shortly after Birkenfeld's guilty plea, it began a series of efforts to examine and close accounts for U.S. taxpayers. *United States v. Credit Suisse*, 14-cr-188-RBS, Statement of Facts, DE 14, ¶¶ 54-63 (EDVa May 19, 2014).

[4] The account closure letter was dated September 7, 2015. It should be noted that Defendant mailed false Forms 1040EZ for 2013 and 2014 to the IRS, on which he reported zero income, on September 15, 2015 – *eight days after* he received the Credit Suisse account closure letter that encouraged him to confess his tax misconduct and make amends.

In October 2015, Defendant contacted an attorney in West Palm Beach and took steps to participate in the OVDP.  Defendant also retained an accountant to prepare the individual and corporate income tax returns that he had failed to file.  Defendant provided the accountant with records of his Credit Suisse accounts, but did not disclose the accounts he held in Croatia or Germany.  Ultimately, Defendant neither entered the OVDP, nor paid the penalty proscribed by that program.  Instead, he made a "quiet disclosure" and filed untimely returns.  He did not remit payment for the taxes, penalties, or interest with the returns.

In 2018, Defendant attempted to sell Company B to staunch the financial bleeding of the company's year-after-year losses.  Undercover IRS Special Agents posed as buyers of Company B and communicated with Defendant on numerous occasions.  In those calls and meetings, Defendant attempted to burnish Company B's profitability by admitting that though Company B appeared unprofitable on paper, it effectively broke even as Defendant used Company B's funds to pay his personal expenses.

## GUIDELINES CACLULATION

The Probation Department provided the following United States Sentencing Guidelines ("U.S.S.G.") calculation in the Pre-Sentence Report ("PSR") which is commensurate with the calculation that Defendant agreed to in the Plea Agreement:

| | |
|---|---|
| Base Offense Level (§2S1.3)<br>Value of the Funds More Than $3,500,000 and Less Than $9,500,000 | 24 |
| Plus:<br>Defendant (A) was convicted of an offense under subchapter II of chapter 53 of title 31, United States Code; and (B) committed the offense as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period (§ 2S1.3(b)(2)) | +2 |
| Minus:<br>Acceptance of Responsibility (§ 3E1.1(a)-(b)) | -3 |
| Total: | <u>23</u> |

8

DE 34, ¶ ¶ 58-68.  Defendant's adjusted offense level is 23, which carries a range of imprisonment of 46-57 months and a fine of $20,000 to $200,000.

## SECTION 3553(A) ANALYSIS

Although the Guidelines, as set forth above, are no longer binding, they reflect the seriousness of the offenses of conviction and the circumstances relating to Defendant's conduct. We respectfully submit that a term of incarceration within the advisory Guidelines range is imperative to provide just punishment commensurate with similarly situated defendants, and emphatically promote general deterrence, specific deterrence, and respect for the law.

In fashioning an appropriate sentence, a district court is obligated to consider the factors set forth in Title 18 U.S.C. § 3553.  The factors in § 3553(a) that the court must consider are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the U.S. Sentencing Guidelines Manual range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

**<u>Nature and Circumstances of the Offense and History and Characteristics of Defendant</u>**

The nature and circumstances of the offenses warrant a significant period of incarceration. As Defendant admitted in the factual proffer and as summarized above, he evaded his income taxes over a period of eight years, from 2007 through 2014, and concealed his offshore bank accounts that at one time held assets worth more than $6.2 million.  DE18.  All the while, Defendant used

millions of his untaxed funds to splurge on a waterfront home, yachts, and gifts to family members and friends.

Three times Defendant had the opportunity to make a clean breast of things and each time he did not do so. First, in 2014, the Service, by mere happenstance, asked Defendant to file a true and accurate return for the 2012 tax return. Instead, Defendant filed a false return on which he lied about his domicile, his income, and the tax due and owing. Further, through that return Defendant had the audacity to demand the IRS pay out to him the de minimis tax that an insurance company withheld from a distribution. Second, after Credit Suisse closed his account in September 2015, they sent him a letter that urged him to get right with the IRS. Defendant did not do so. Instead, weeks later, he filed two more returns on which he falsely claimed he resided outside the United States and earned no income. Indeed, he went so far in this scheme as to inscribe a Croatian return address on the envelope in which he mailed the 2013 Form 1040EZ (even though it was postmarked from West Palm Beach).

While there may be cases where it can be said that a defendant's offense conduct was in some way wildly aberrant or representative of so brief and isolated a lapse in judgment that it is appropriate to give significant weight to an otherwise blameless life, this manifestly is not such a case. For years, Defendant participated in multi-faceted tax fraud involving offshore accounts that were designed to cheat the IRS and other taxing authorities. That cheating involved numerous forms of concealment, including offshore bank accounts, a nominee owner of Company A who filed false returns, falsely claiming that he was not a U.S. resident, and false statements made under oath, on the tax returns that he eventually filed.

While the Government does not dispute that Defendant may be a caring brother, father and grandfather and may have suffered some level of emotional trauma in his life, DE 35, pp. 7-10, the

Court should not lose sight of the facts at hand regarding the offense and the characteristics. Simply put, for years Defendant hid his assets in offshore accounts and cheated the IRS out of the tax it was owed and, when confronted by the IRS with his failure, brazenly filed a false tax return to defraud the IRS out of what little tax it could collect.

## Seriousness of the Offense

Defendant argues that the advisory Guidelines calculation "significantly overstates the seriousness of the offense" because the offense level uses § 2B1.1 to adjust the offense level upwards based on the amount of funds involved. DE 35, p. 6. Defendant fails to explain how the use of § 2B1.1 overstates the harm that he caused. For years the use of secret Swiss accounts was an expensive but nearly foolproof means of hiding assets and income from the IRS. The Swiss legal regime criminalized the disclosure of account information and information sharing between the Swiss and U.S. governments was near non-existent. Not only did Defendant exploit such an account, but he provided false information to the bank about his residence and nationality to maintain that account when the bank was taking efforts to eject U.S. account holders. Given the planning and complexity of the scheme, as well as the exploitation of a foreign legal regime, it is perfectly appropriate to use the amount of funds to adjust upwards the Guidelines calculation.

Even if the Court were to entertain Defendant's argument to discount the harm caused by Defendant's failure to report his offshore bank accounts, the tax harm cannot be ignored. Defendant has agreed that he evaded $2,789,538 in income tax. The advisory Guidelines calculation under Section 2T would not be materially different as it would yield an adjusted offense level of 21 with a recommended sentence of 37 to 46 months incarceration:

| | |
|---|---:|
| Base Offense Level (§§ 2T1.1(a)(1), 2T4.1(I))<br>Tax Loss More Than $1,500,000 and Less Than $3,500,000 | 22 |
| Plus:   Sophisticated Means (§ 2T1.1(b)(1)) | +2 |
| Minus: Acceptance of Responsibility | <u>-3</u> |
| Total: | <u>21</u> |

While $2,789,538 is a mighty amount of tax loss, it understates the actual harm as the Government was unable to calculate all the tax harm caused by Defendant. First, because banks destroy records in the normal course of business, the Government was not able to calculate unreported income and tax loss for 2000 through 2006, years that Defendant never filed income tax returns. Further, because of spotty records kept by Defendant regarding the employees of Company A, the Government could not calculate either the amount of employment taxes, Social Security taxes, and Medicare taxes that Defendant failed to withhold from the employees of Company A and pay over to the IRS or the amounts of those same taxes that Company A should have paid to the Service.

### **Charitable Works**

Defendant has argued that the Court should grant a downward variance or departure based on his charitable works and community involvement. DE 35, pp. 12-14. While the good deeds cited in the Defendant's submission are praiseworthy, isolated eleemosynary acts cannot compensate for criminal conduct as lengthy, harmful, and audacious as Defendant's. As the Seventh Circuit succinctly observed: "Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card." *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010).

In *Vrdolyak*, the court reversed a probation-only sentence for a white-collar criminal who defrauded his large institutional victim of $1.5 million.[5] The court of appeals found it error for the district court to give "enormous weight" to the charitable acts of the defendant "while virtually ignoring the evidence that tugged the other way." 593 F.3d at 682. The court explained that charitable contributions "must be exceptional before they will support a more-lenient sentence" because "it is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives, to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts." *Id*. (quoting *United States v. Repking*, 467 F.3d 1091, 1095 (7th Cir. 2006)). The court continued:

> To allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines. Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory, and suggests that society can always be bought off, even by those whose criminal misconduct has shown contempt for its well-being.

*Id*. (quoting *United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990)).

Likewise, in *Repking*, the Seventh Circuit rejected an (effectively) probationary sentence for a white-collar criminal, vacating as substantively unreasonable a one-day sentence of imprisonment in a million-dollar bank-fraud case — notwithstanding the defendant's restitution to his victim, his negligible chance of recidivism, his charitable works in the community, and even his cooperation with the government's criminal investigation. *See* 467 F.3d at 1094-95. Noting the Guidelines' policy statement that a defendant's charitable contributions are "not ordinarily

---

[5] The issue before the court in *Vrdolyak* was procedural unreasonableness since the government appealed only on that ground. *See* 593 F.3d at 684. *See also* Brief of the United States, *United States v. Vrdolyak*, No. 09-1891 (7th Cir. filed July 17, 2009), *available at* 2009 WL 2251149. But the court's reasoning applies equally to an analysis of substantive unreasonableness, and in particular to whether a sentence gives unreasonable weight to a defendant's charitable contributions and letters from the recipients of his patronage.

relevant," *see* U.S.S.G. § 5H1.11, the court held that consideration of a defendant's charitable works "is not specifically prohibited, especially in a post-Booker world." *Id*. at 1095. The court found substantively unreasonable the district court's conclusion that the defendant's "charitable works were so extraordinary that they should be given weight despite the contrary view of the Sentencing Commission," stating:

> [W]e leave opens the possibility that a one-day sentence of imprisonment might be justifiable for a defendant who rivals Robin Hood; but Repking, a millionaire who stole for himself and his friends, is not that defendant.

*Id*. at 1096. *See also United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (defendant's civic contributions, not atypical for prominent businessman, did not support nine-level downward departure); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's charitable and other good works did not justify departure from Guidelines); *United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) (defendant's charitable and volunteer activities did not make him atypical).

### Restitution and Acceptance of Responsibility

Defendant urges the Court to impose a noncustodial sentence on the grounds that his acceptance of responsibility for his crimes and his attempts to pay down a portion of the restitution equate to extraordinary cooperation. The Government concedes that Defendant readily admitted to his crimes, provided the Government with every assistance to confirm his guilt, and took the initiative to liquidate assets to make restitution. The Government will brook no argument that Defendant has been anything but cooperative and forthcoming.

However, the Government urges the Court to consider that the celerity of Defendant's decision making reflects the strength of the case built by the Government. Defendant became aware of the investigation when he was served with grand jury subpoenas that specifically

14

requested documents related to the offshore accounts that he had concealed for years. Furthermore, with service of those subpoenas, he realized that the potential buyers of his business who he had arranged to meet that day actually were undercover law enforcement agents to whom he had made incriminating statements. Finally, shortly after service of those subpoenas, Defendant became aware that the IRS was executing a search warrant at the home/office of Person A, the nominal owner of Company A, who had all the financial records of the business and Defendant's untaxed income. While Defendant agreed to plead guilty in short order, it must be reckoned that the Government's overwhelming evidence was a significant precipitant.

Defendant has taken efforts to pay down some of the restitution he will owe to the IRS. While those efforts should be acknowledged, the payments of taxes owed for years passed should not be deemed either praiseworthy or extraordinary. Rather, that should be the minimum expected of defendants with means. To that end, while Defendant may describe himself as a "broken old man" and "abject failure," his inability to pay all the restitution is the product of Defendant squandering his assets on: buying yachts, maintaining them, and shipping them to the Mediterranean; purchasing a house for $1,600,000 that he gave to a girlfriend; gifting jaw dropping sums to family and friends; and sinking money into Company B, which never turned a profit. This Court can fashion a just punishment for his crimes to not only punish Defendant for his misdeeds, but to signal to society that white-collar crimes and white-collar defendants are subject to the same Sentencing Guidelines as similar criminals and crime schemes.

**A Period of Incarceration will Provide Just Punishment and Afford Adequate Deterrence**

Defendant's use of his Swiss bank accounts was integral to his scheme to defraud the United States. Over an eight-year period, Defendant failed to report over $7.7 million of income, concealed more than $6.2 million in secret Swiss and foreign accounts, and caused more than $2.7

million in loss to the fisc.  In the course of sentencing Peter Amrein, a Swiss asset manager who conspired with U.S. taxpayers to hide their assets in Swiss accounts, U.S. District Judge Jed S. Rakoff aptly summarized the motivations and attitudes of U.S. taxpayers who such accounts to evade their taxes:

> [I]n the Court's view, the most culpable people in this entire situation are the U.S. taxpayers who knowingly, willfully, intentionally, and in disregard not just of the law, but of the most elementary regard for their fellow citizens chose to evade taxes through the device of these secret Swiss bank accounts.
>
> I've never understood why so many of these taxpayers wind up getting off the hook in the sense that they get immunity, though they have to pay a lot of money, when what they have chosen to do is motivated by the most elementary greed.  If they thought about it for even a half second, which they obviously rarely do, what they are saying is, let the rest of the American public pay for all the things that we look to our government for.  Let them pay more than their fair share so we can get more money in our personal pockets.  It's disgusting.  It's repulsive.  It is something that does not commend itself to this Court.

*United States v. Amrein*, 13 Cr. 0972 (JSR) (SDNY), Sentencing Tr. Pp. 5-6 (Mar. 22, 2018). Exhibit A.  It is the Government's position that criminal conduct of such duration, complexity and magnitude requires a significant sentence of incarceration to provide just punishment to Defendant and afford adequate deterrence.

A sentence that includes a period of incarceration would also prevent sentencing disparities among similarly situated defendants.  The Government asks this Court to reject Defendant's appeal for a non-incarceratory sentence.  One of the goals of sentencing is to promote respect for the law, to deter similar conduct, and to avoid unwarranted sentencing disparities.  The Eleventh Circuit as opined in numerous cases that "general deterrence is an important factor in white-collar cases, where the motivation is greed."  *United States v Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014). Some downward variances have been set aside on appeal where there was "little to no imprisonment because they do not constitute just punishment for the offense, do not promote

16

respect for the law, and will not do much to deter similar criminal activity by others." *Id*. In *United States v Crisp*, the Eleventh Circuit vacated a sentence that involved a downward variance to probation and five hours in custody from a guideline range of 24-30 months' imprisonment where the defendant, a comptroller of a construction company, knowingly prepared false financial statements that defrauded a bank of nearly $500,000. *United States v. Crisp*, 454 F.3d 1285 (11th Cir. 2006). In *United States v McQueen*, a sentence that included a downward variance to one-month imprisonment from a recommended guideline range of 15-21 months was also vacated as unreasonable, with the Eleventh Circuit opining that sentencing courts need to avoid sentencing disparities among criminal defendants in other cases who were convicted of similar crimes. *United States v McQueen*, 727 F.3d 1144, 1160 (11th Cir. 2013). Similarly situated defendants charged with violating the same statute not just in the Southern District of Florida, but in the northern division, were not granted downward variances, but were sentenced at the low end of their advisory guideline range. *See United States v Cioffi*, 12-80096-DTKH, and *United States v Salgado*, 12-80008-KAM. To prevent sentencing disparities, the Government asks this Court to deny Defendant's Motion.

This Court can fashion a sentence to not only punish Defendant for his misdeeds, but to signal to society that white-collar crimes and white collar defendants are subject to the same Sentencing Guidelines as similar criminals and crime schemes. Section 3553(a) emphasizes the importance of considering pertinent policy statements issued by the Sentencing Commission. See 18 U.S.C. § 3553(a)(5)(A). The Sentencing Commission has spoken forcefully to the circumstances of this case:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Ch. 2, Pt. T, intro. comment.

The recommended sentencing Guideline range is 46-57 months.

WHEREFORE, the Government respectfully submits that a sentence within the advisory guideline range of 46 to 57 months is appropriate given the facts of circumstances of this case and the history and characteristics of the Defendant.

Respectfully submitted,

STUART M. GOLDBERG
ACTING DEPUTY ASSISTANT
ATTORNEY GENERAL
TAX DIVISION

By: _Mark F. Daly_
MARK F. DALY
SENIOR LITIGATION COUNSEL
TAX DIVISION


JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

By: s/ _Aurora Fagan_
AURORA FAGAN
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Florida Bar No. 188591